UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY WARREN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22-cv-00661-TWP-DML |
| | ) |
| WEXFORD OF INDIANA, LLC., | ) |
| MD MARTIAL KNIESER, | ) |
| AMBER PLASTERER, | ) |
| LISA HAMBLEN H.S.A, | ) |
| SHERI WILSON PA, | ) |
| DUSHAN ZATECKY WARDEN, | ) |
| DENNIS REAGLE DEPUTY WARDEN, | ) |
| AARON SMITH ADMINISTRATION ASSISTANT, | ) |
| MCCUTCHEONS LT., | ) |
| SARAH PECKHAM AMBURN UTM, | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendant Sarah Peckham Amburn ("Amburn") (Dkt. 148). Following screening,[1] *pro se* Plaintiff Larry Warren ("Warren") was allowed to pursue his claim of Eighth Amendment conditions-of-confinement and First Amendment retaliation claims against Amburn, who allegedly refused Warren's requests to move him away from a drafty window, and once moved placed him in a dorm with unsanitary conditions, and then Amburn refused his requests to be moved back. For the reasons explained in this Order, Amburn's Motion for Summary Judgment is **granted**.

---

[1] In screening his Complaint, the Court determined Warren could bring the following claims: (1) injunctive relief against Deputy Warden Reagle in his official capacity; (2) Eighth Amendment medical care claims for damages against Wexford, Dr. Knieser, Nurse Amber, Ms. Gibson, Nurse Wilson, Warden Zatecky and Deputy Warden Reagle; (3) Eighth Amendment conditions-of confinement claims for damages against Warden Zatecky, Deputy Warden Reagle, Mr. Smith, Lt. McCutcheons, Amburn, and Nurse Wilson; and (4) First Amendment retaliation claims against Amburn and Nurse Wilson. (Dkt. 11 at 14). Motions for Summary Judgment filed by the State Defendants (Dkt. 149), and Health Care Defendant's (Dkt. 161) are addressed in separate Orders.

## I. LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II. FACTUAL BACKGROUND

In 2018, Warren moved into O-3 Dorm at Pendleton Correctional Facility ("Pendleton"). The unit consisted of two rows of four beds in an open space. Every inmate in the unit, including Warren, was a military veteran. (Dkt. 150-1 at 106:5–108:8, 113:20–115:7). While Warren was housed in O-3, inmates received the same privileges available to general population inmates. *Id.* at 111:10–112:23. Warren's assigned bed was near an exhaust fan that pulled air from the hallway. *Id.* at 108:9–19. The cold air from the fan made Warren uncomfortable and, he became ill. *Id.* at 116:15–117:7.

During the relevant time period, Amburn was a unit team manager at Pendleton. (Dkt. 150-10 at ¶ 1). Warren asked Amburn orally and in writing to be moved to a different bed. (Dkt. 150-1 at 116:1–14). Specifically, he requested to be placed next to a heater so he could keep warm during the winter. *Id.* at 116:15–117:7; (Dkt. 150-11 at 14). The record does not clearly delineate the process for approving a bed change, but the Court assumes for purposes of summary judgment that Amburn had the authority to change Warren's bed assignment.

A "Request for Interview" written by Warren, addressed to Amburn, and dated November 17, 2018, states:

> I would like to speak with you about moving out of Bed 1 and away from this constant air blowing on me. I've been sick and seeing medical over issues that I do not know what's causing the pain I am in.

(Dkt. 173 at 26). A year later, a second "Request for Interview" written by Warren, addressed to Amburn, and dated November 12, 2019, states:

> I have sent multiple requests and spoke to you about moving me away from the Hall window as I'm constantly feeling sick and have to lay under blankets just to keep this cold air off me. You move other men around. Why are you not moving me away from this window?

*Id.* at 25[2]. Amburn did not facilitate a move for Warren, even after a space became available when an inmate left one of the veterans' dorms. (Dkt. 173 at 185).

In March 2020, the COVID-19 pandemic hit the world, and no one, including Warren and or Pendleton officials could predict how long the pandemic would last. (Dkt. 150-1) On April 3, 2020, Amburn told Plaintiff that he was moving. Warren was the only inmate from the veterans' dorm chosen to move. Amburn also moved eight men out of O10-Dorm and placed one of those inmates into Warren's O-3 bed. (Dkt. 150-1 at 109). Warren was moved to K-4 dorm and was not given a reason for the move. *Id.* at 127:5–8. However, a correctional officer conveyed to Warren that the move would be temporary and COVID-related. *Id.* at 122:19–123:17. Within six weeks, the other inmates who moved with Warren returned to their places in O-10, and the inmate assigned to Warren's bed in O-3 moved as well. (Dkt. 173 at 187). Nevertheless, Warren remained in K-4 Dorm. *Id.*

K-4 is a general population dorm. (Dkt. 150-1 at 121:16-24, 132:9-12). K-4 is an open style dormitory housing 36 men with bunkbeds on one side, single beds on the other, and has five sinks, two showers, and a bathroom area. *Id.* at 122:3-18. While in K-4, Warren was exposed to unsanitary conditions, asbestos, lead paint, and numerous infectious diseases. (Dkt. 173 at 188). Further, "[i]t was well known" before Warren was transferred to K-4 that the first inmate to die from COVID at Pendleton was from K-4. *Id.* Warren addressed a Request for Interview to Amburn in June 2020, but it is illegible. *See id.* at 27.

On July 6, 2020, Warren wrote a grievance alleging that Amburn moved him from O-3 to K-4 in "retaliation," although the grievance does not specify the basis for the retaliation. (Dkt. 150-11 at 13–15). In response to Warren's grievance related to the bed move, Amburn explained:

---

[2] There is no evidence that Ms. Amburn received either document and the precise contents of his oral communications with Ms. Amburn are not documented.

> Offender Warren was moved out of upper ODorm because his bed was needed for an ICAN [Indiana Canine Assistant Network] offender. Upper ODorm was used as part of the Covid quarantine area and I had to move offenders out of the dorm to accommodate the ICAN[3] program remaining in upper ODorm. Offender Warren is still being housed in a general population, working dorm and no housing is guaranteed here. Classifications was responsible for moving offenders back into their specific beds but in some cases this could not be accommodated. Upper ODorm holds the ICAN program and housing for that takes priority. He can write UTM Hinshaw to be put on the list of offenders that want to move back into ODorm. I'm no longer over upper ODorm.

(Dkt. 150-11 at 12). Warren does not dispute that Amburn was no longer responsible for O Dorm when he submitted his grievance in July 2020. He remained in K-4 until April 2024. (Dkt. 170 at ¶ 46).

### III.   ANALYSIS

Warren asserts that Amburn was deliberately indifferent to his conditions of confinement in both O-3 and K-4 and that she retaliated against him for seeking a bed change by sending him to K-4 in April 2020 and then not facilitating his return. Viewing the record in the light most favorable to Warren, no reasonable trier of fact could resolve either claim in his favor.

**A.   Eighth Amendment Claims**

"Prisons are not required to provide a maximally safe environment, but they must address easily preventable, observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison*, 835 F.3d 681, 683 (7th Cir. 2016) (cleaned up). A prison official "violates the Eighth Amendment upon exhibiting 'deliberate indifference to a substantial risk of serious harm to an inmate.'" *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 828 (1994)).

A conditions-of-confinement claim includes objective and subjective components. *Giles*

---

[3] Indiana Canine Assistant Network (ICAN) is a program that was run out of Upper O-dorm during the time period. (Dkt. 150-10 at 6). The ICAN program has inmates dog handlers who train service dogs in the facility for the dogs to be placed with individuals with disabilities. (Dkt. 150-10 at 6); (Dkt. 150-1 at 110:8-19).

5

*v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). An excessive risk is synonymous with "a substantial risk of serious harm." *Farmer*, 511 U.S. 825, 837 (1994).

Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

 1. **Conditions in O-3**

Even construed in the light most favorable to Warren, the record does not support a finding that Amburn was subjectively aware that he faced an excessive health and safety risk while assigned to the bed near the exhaust fan in O-3. The record therefore entitles Amburn to summary judgment for three reasons.

First, Warren asserts that he encountered multiple illnesses while confined in O-3. *(*Dkt. 170 at 96–101). But he does not offer any evidence that Amburn knew about any of these conditions. Rather, the only evidence from which a jury could conclude that Amburn knew of any risk to Warren's health are his two requests for interview in November 2018 and November 2019, in which he reported that he had "been sick" and was "constantly feeling sick." (Dkt. 173 at 25–26). These statements were written a year apart and offer no information about Warren's symptoms that would allow Amburn—who is not a medical professional—to infer that placement next to the

6

exhaust fan was causing him to become sick or otherwise placed him at serious risk of harm.

Second, assuming Warren was exposed to cold air frequently enough, and for long enough, to support an Eighth Amendment claim, the record does not allow a finding that Amburn knew he lacked adequate protection from the cold. To prevail, Warren must demonstrate not only that he was exposed to cold, but that he lacked adequate clothes, bedding, or other materials to keep warm. *Dixon v. Godinez*, 114 F.3d 640, 643 (7th Cir. 1997). Warren's claim is that he was exposed to cold air *in his bed*—not everywhere in O-3. Warren stated to Amburn in one of his written complaints that he had "to lay under blankets just to keep this cold air off" of him. (Dkt. 173 at 26). If Warren succeeded in notifying Amburn that he was exposed to cold air from the exhaust fan, he also succeeded in notifying her that he was able to protect himself from that air with blankets. Accordingly, Amburn was not deliberately indifferent as having to lay under blankets to keep warm in bed is a common experience both inside and outside of prison, and not a condition carrying an excessive risk of serious harm.

Third, the specificity of Warren's request to be moved is evidence that Amburn would not have perceived him as facing a serious risk of harm. Warren did not merely ask to be moved to a bed away from the exhaust fan; he asked to be moved *within O-3*, which consisted only of eight beds. (Dkt. 173 at 185–186). He also did not merely ask to be moved within O-3; he asked to be moved *next to a heater*. (Dkt. 150-1 at 116:15–117:7; Dkt. 150-11 at 14). Based on the designated evidence, it was reasonable for Amburn to interpret Warren's requests to change beds as efforts to improve his conditions or even to obtain preferential treatment. A jury would not have an evidentiary basis for concluding that she knew of and ignored a substantial risk of serious harm.

### 2. Conditions in K-4

Construed in the light most favorable to Warren, the record also would not allow a jury to

find that Amburn was deliberately indifferent to a substantial risk of serious harm when she transferred Warren to K-4 in April 2020 or when she did not transfer him back to O-3 several weeks later.

Whether or not conditions in K Dorm were inhumane, no evidence supports an inference that Amburn *knew* when she transferred Warren that the conditions in K Dorm were unreasonably hazardous. Warren attests that "[i]t was well known" that an inmate from K-4 was the first inmate at Pendleton to die from COVID-19. (Dkt. 173 at 188). But Warren has not presented any evidence that Amburn knew that fact when she transferred Warren. Further, the record does not tell when that inmate died, much less support a trier of fact in concluding that Amburn knew Warren faced a higher risk of contracting COVID in K-4 compared to any other unit in April 2020. There is no evidence that she knew about conditions Warren encountered in K-4 until she responded to his July 6, 2020, grievance. (Dkt. 150-11 at 12). Warren has not designated any evidence to contradict Amburn's assertion that she was no longer responsible for O-3 at that time and could not facilitate his transfer back to that unit.

Again, the specificity of Warren's complaint is problematic. He did not complain of inhumane conditions in K-4 and demand that they be remedied, or even that he be transferred to another unit without the same problems. Warren's complaint against Amburn is that she did not transfer him back to O-3. The Eighth Amendment protects Warren against cruel and unusual punishment. It did not entitle him to reside in a particular bed in a particular, eight-person unit. Because that is the violation he seeks to vindicate, Amburn is entitled to summary judgment.

B.  **First Amendment Claims**

To establish a prima face case for retaliation on summary judgment, a plaintiff must have evidence to support three elements. "First, he must show he engaged in protected First Amendment

activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

"The standard for determining whether an action is sufficiently adverse to constitute retaliation is well established: it must be 'likely [to] deter a person of ordinary firmness from continuing to engage in protected activity.'" *Id.* at 880 (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)). "This is an objective standard; it does not hinge on the personal experience of the plaintiff." *Id.*

The "motivating factor" requirement "amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). "Suspicious timing alone will rarely be sufficient to create a triable issue" on the motivating factor element, especially where an alternative motive exists. *Id.* To establish that retaliatory animus was a motivating factor in the defendants' retaliatory action, the plaintiff must show, at a minimum, that the defendant was aware of the plaintiff's protected activity. *See, e.g.*, *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (affirming grant of summary judgment when inmate presented only "vague and confusing testimony that [the inmate], at some point, named [the defendant] in a grievance" but "no evidence about what the grievance said or whether [the defendant] even saw or knew about it").

If a plaintiff establishes the above three elements of a retaliation claim, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Hawkins v. Mitchell,* 756 F.3d 983, 996 n.10 (7th Cir. 2014) (internal quotation omitted). "And if the defendant does this, 'the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus.'" *Id.* (quoting *Thayer*, 705 F.3d at 252). "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational

9

finder of fact could infer the proffered reason is a lie." *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011).

Warren's retaliation claims against Amburn fail on the second and third elements. The record would not allow a reasonable trier of fact to find that his movement from O-3 to K-4 would deter a prisoner of ordinary firmness from engaging in protected speech or that Warren's movement from O-3 to K-4 was motivated by retaliatory animus.

Transfer from one general population unit to another, without an increase in restrictions, typically does not amount to an adverse action supporting a retaliation claim. *Holleman*, 951 F.3d at 881. Perhaps Warren really encountered "serious changes of circumstances that would likely deter a person of ordinary firmness" from engaging in protected activity. *Id.* Again, though, there is no evidence that Amburn knew about those different circumstances when she transferred Warren to K-4 or that she could transfer him back to O-3. For that reason, there is no basis for finding that she transferred Warren to K-4 or left him there based on retaliatory animus.

Warren alleges that Amburn ignored his requests for a bed change for two years, then retaliated against him by granting a bed change. It would be "absurd" to apply the First Amendment as "requiring prison officials to respond to every grievance by enacting the prisoner's preferred solution." *Holleman*, 951 F.3d at 879. That is exactly the claim Warren makes against Amburn. He asked to be assigned to one of a couple beds in O-3. If she did not move him at all, she subjected him to cruel and unusual punishment; if she moved him anywhere else, she retaliated against him for making the request.

Even if Plaintiff could establish a prima facie case of retaliation against Amburn, the undisputed evidence shows that Amburn had proper justification for moving Warren to K-4 given the need for quarantine units during the height of the COVID-19 pandemic and prioritizing the

ICAN offenders.

The thrust of Warren's claims against Amburn is not that his bed in O-3 or the conditions in K-4 were so hazardous that subjecting any inmate to them would be cruel, or that subjecting any inmate to such harsh conditions would be deter him from exercising his First Amendment rights. Rather, Warren argues that Amburn should have subjected *other inmates* to those conditions and assigned him to the bed of his choice. (Dkt. 170 at ¶¶ 43,[4] 59,[5] 70,[6] 107.[7] The Court does not doubt that the conditions Warren experienced were uncomfortable, however, the Constitution did not require Amburn to give Warren the accommodations he requested, and no reasonable trier of fact could find that she violated his rights by declining to do so.

## IV.  CONCLUSION

For the reasons explained in this Order, Amburn's Motion for Summary Judgment, Dkt. [148], is **GRANTED**. The claims against Amburn are **dismissed with prejudice**.

No partial final judgment will issue.

**SO ORDERED.**

Date:   6/30/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

---

[4] "Ms. Amburn made convenient moves for others in upper dorm to include inmate Michael Wright who was in the veteran's dorm and allowed him to move one bed behind his bed in the 2nd row, bed 3 to bed 4 just a short time prior to April 3, 2020. Mr. Wright wanted to be next to the heater. Mr. Warren spoke to Ms. Amburn and Lt. Jackson about him wanting that open spot, but Mr. Warren would be denied again. Mr. Wright was the shelter Rep for O dorm, and he was to be considered a favorite of Ms. Amburn."

[5] "There were 7 other dorms and 47 other men that Ms. Amburn could have chosen to move. She could have chosen any of those 47 men to move in order to accommodate one of her favorites Mr. Robertson, however, Ms. Amburn maliciously and in retaliatory motives chooses the one person Mr. Warren that complained of being sick and asking for relief from the draft hallway window."

[6] "This move on April 3, 2020 would never of happened to Mr. Warren if Ms. Amburn would have not discriminated against him and picked Mr. Warren to be one of her favorites as she did with Mr. Roberson, Mr. Wright and other individuals that Mr. Warren listed in the exhibits."

[7] "If Mr. Warren was a favorite like Mr. Robertson or Mr. Wright would then Mr. Warren would have never been selected by Ms. Amburn to have him moved in the first place."

11

Distribution:

LARRY WARREN
230853
PENDLETON – CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov

Joseph A. Panatera
Cassiday Schade LLP
jpanatera@cassiday.com

David Matthew Price
Office of the Indiana Attorney General
david.price@atg.in.gov