UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY WARREN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:22-cv-00661-TWP-MJD |
| ) | |
| WEXFORD OF INDIANA, LLC., ) | |
| MD MARTIAL KNIESER, ) | |
| AMBER PLASTERER, ) | |
| LISA HAMBLEN H.S.A, ) | |
| SHERI WILSON PA, ) | |
| DUSHAN ZATECKY WARDEN, ) | |
| DENNIS REAGLE DEPUTY WARDEN, ) | |
| AARON SMITH ADMINISTRATION ) | |
| ASSISTANT, ) | |
| MCCUTCHEONS LT., ) | |
| SARAH PECKHAM AMBURN UTM, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed by Defendants Warden Dushan Zatecky ("Zatecky"), Deputy Warden Dennis Reagle ("Reagle"), Administrative Assistant Aaron Smith ("Smith"), and Lieutenant Joseph McCutcheon ("McCutcheon") (collectively, the "State Defendants") (Dkt. 148).[1] *Pro se* Plaintiff Larry Warren ("Warren") initiated this action on April 1, 2022 by filing a Prisoner Complaint under 42 U.S.C. §1983. (Dkt. 2). This lawsuit is based on Warren's allegations that his custodians at Pendleton Correctional

---

[1] Defendant Sarah Peckham Amburn moved separately for summary judgement concerning the claims against her (Dkt. 148), and Defendants Dr. Martial Knieser, Lisa Hamblen, Sheri Wilson, PA/NP, Amber Plasterer, RN and Wexford of Indiana, LLC ("Wexford") (collectively, the "Medical Defendants") moved separately for summary judgment concerning the claims against them (Dkt. 161). Those motions are addressed in separate Orders. Therefore, in this Motion, the Court refers only to the four defendants: Zatecky, Reagle, Smith and McCutcheon, (collectively, "the State Defendants").

Facility ("Pendleton") subjected him to inhumane conditions of confinement and officials were deliberately indifferent to his serious medical needs. For the following reasons, the State Defendants' Motion for Summary Judgment, is **granted**, and claims against them are **dismissed with prejudice**.

## I. LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

2

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.  DISCUSSION

The Court identified the following claims in its 2023 Screening Order:

> (1) injunctive relief against Deputy Warden Reagle in his official capacity; (2) Eighth Amendment medical care claims for damages against Wexford, Dr. Knieser, Nurse Amber, Ms. Gibson, Nurse Wilson, Warden Zatecky and Deputy Warden Reagle; (3) Eighth Amendment conditions-of confinement claims for damages against Warden Zatecky, Deputy Warden Reagle, Mr. Smith, Lt. McCutcheons, Ms. Amburn, and Nurse Wilson; and (4) First Amendment retaliation claims against Amburn and Nurse Wilson.

(Dkt. 11 at 14). This Order addresses the State Defendants motion for summary judgment on the claims pending against to them. The Court will discuss each claim in turn.

## III.  MEDICAL CARE CLAIMS

When the Court screened Warren's complaint in 2023, it found that he "adequately stated claims for damages against Zatecky and Reagle, both of whom are alleged to have known that Warren was not receiving adequate medical treatment and failed to take steps to ensure he received such treatment." (Dkt. 11 at 12). The Court permitted Warren to pursue Eighth Amendment medical care claims against Pendleton via Zatecky and Reagle on that basis. *Id.*

### A.  FACTS

In March 2020, the COVID-19 pandemic hit the world, and no one, including Warren and or Pendleton officials could predict how long the pandemic would last. (Dkt. 150-1).

3

In May 2020, Warren submitted a healthcare request complaining of multiple symptoms including that he was suffering from left flank pain and abnormal bowel movements. (Dkt. 163-1). He saw Nurse Amber Plasterer ("Nurse Plasterer") on May 29 and then again on June 3. On May 29, she treated Warren for a skin condition, and on June 3, she referred him to a doctor based on abdominal pain. (Dkt. 150-2 at 41–46). Warren believes Nurse Plasterer should have addressed all his complaints on the first visit. (Dkt. 172 at ¶ 12).

On June 4, 2020 Warren submitted a grievance asking to be tested for COVID-19. (Dkt. 150-5 at 11). A grievance specialist responded two weeks later that any medical testing would be done at the discretion and direction of the medical staff. *Id.* at 10. Zatecky responded to a grievance appeal on July 8 and echoed that response. *Id.* at 5.

Also on June 4, 2020 Warren submitted a grievance that there was no hand sanitizer in K-4 dorm and requesting that the prison staff should make hand sanitizer available throughout his housing unit rather than just outside the infirmary and the officers' station. (Dkt. 150-6 at 10). He also reported that he has been sick and was experiencing pain and bleeding from his anus. *Id.*

Two weeks later, a grievance specialist responded that, due to a shortage of hand sanitizer, it was only placed in areas (such as dining halls and the infirmary) where inmates could not wash their hands with the soap issued to them individually. *Id.* at 9. On July 8, Zatecky responded to a grievance appeal, echoing that limited hand sanitizer supplies had been distributed to areas where inmates gather. *Id.* at 5.

Warren visited Nurse Naomi Briner ("Nurse Briner") for an annual checkup on June 11, 2020. (Dkt. 150-2 at 51–53). Nurse Briner noted that Warren complained of multiple issues, but none required immediate treatment. *Id.* at 52. Nurse Briner also noted that Warren "sees m/h" and reported "having concerns and fear about COVID and the handling of it and waiting to get the

virus." *Id*. The very next day, Warren saw Physician Assistant Sherri Wilson ("Wilson") regarding his reports of abdominal pain. *Id.* at 58–61. She ordered a battery of tests. *Id.* at 61. He was tested for tuberculosis that day. *Id.* at 75.

On June 8, 2020 Warren submitted a grievance complaining that Nurse Plasterer should have addressed all his symptoms—pain and bleeding from his rectum—and not just his skin issues, during his May 29 examination. (Dkt. 150-7 at 9). A grievance specialist responded on June 22 and noted that "[a]ppropriate testing and further evaluation was ordered for any follow up deemed necessary"] and Warren was seen regarding his additional concerns on June 12, 2020 with Wilson. *Id.* at 8. Zatecky responded to a grievance appeal on July 8 and deferred to the medical staff's judgment that Warren had received appropriate medical attention. *Id.* at 4.

On June 25, 2020 Warren submitted a grievance requesting follow-up testing for tuberculosis. (Dkt. 150-8 at 11). He complained specifically of redness near the testing site. *Id.* On July 6, Dr. Martial Kneiser saw Warren for a rash, determined that it should be treated as a symptom of Lyme disease, and prescribed an antibiotic. (Dkt. 150-2 at 82–84). It is not clear whether the rash was the same skin condition described in Warren's June 25 grievance. *Id.* Warren received a follow-up tuberculosis test on July 9, 2020. *Id.* at 86–88. On July 15, 2020 Wilson diagnosed Warren with latent tuberculosis and prescribed two medications. *Id.* at 92–94.

On July 16, 2020 a grievance specialist responded to Warren's June 25 grievance requesting follow-up tuberculosis testing. (Dkt. 150-8 at 9). The grievance specialist stated that the nursing staff would follow up for additional testing if needed. *Id.* Warren appealed that response and complained that he had not received his medication and Wilson's treatment was insufficient. *Id.* at 6. Reagle responded on July 28, 2020 that Warren received the re-test he requested and would receive the treatment the medical staff deemed necessary. *Id.* at 4.

On August 5, 2020 Warren saw Wilson about side effects from his tuberculosis medication. (Dkt. 150-2 at 109–13). On August 11, Warren submitted a grievance complaining of multiple medical conditions and asking for a second opinion regarding his tuberculosis diagnosis. (Dkt. 150-9 at 11–12). The grievance specialist responded on August 25 that Warren was receiving proper treatment for his diagnosis. *Id.* at 10. Warren appealed, and Reagle responded on September 16, 2020, again deferring to the judgment of the medical staff. *Id.* at 6.

"During the time in question in this Complaint, Warren never received any testing or treatment for what could have been COVID-19 symptoms." (Dkt. 172 at ¶ 16). Based on the documents Warren cites in that paragraph, *see* dkt. 173 at 59, Warren believed he became ill with COVID-19 in March 2020, then requested testing for the virus in May 2020.[2] Warren also believed he was exposed to the virus in late April or early May 2020. (Dkt. 173 at 44).[3]

**B.    Legal Standard**

The Eighth Amendment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021).

---

[2] Warren does not cite any evidence that testing was available at that time, what treatments were available, or how testing him in May 2020 would have allowed for effective treatment if he contracted the virus in March 2020.

[3] Again, Warren does not cite evidence that testing, or treatments were available or how he could have been treated effectively had he tested positive.

"A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). Deliberate indifference requires a finding that the defendants "consciously disregarded a serious risk to [Warren's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, the plaintiff must offer evidence that the defendants "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

The Seventh Circuit has held that deliberate indifference occurs when the defendant does any of the following: (1) renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)); (2) refuses "to take instructions from a specialist." *Id.*; (3) persists "in a course of treatment known to be ineffective." *Id.* at 729–30.; (4) chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10); or (5) effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

Importantly for Zatecky and Reagle, the "division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . absent a reason to believe (or actual knowledge) that prison

doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (internal quotations omitted).

C. **ANALYSIS**

The State Defendants argue that they are entitled to summary judgment because they could not have been deliberately indifferent to any serious medical need Warren complained of in 2020. They were aware only of the medical conditions he communicated to them in grievances, and Warren's grievances and the grievance specialists' responses all indicated that he was consistently receiving treatment from medical professionals.

Warren responds: "There is overwhelming evidence that either supports Zatecky or Reagle should have doubted the medical professional's responses as they were aware of the mistreatment and non-treatment by the medical professionals. . . . Neither man never attempted to follow-up to see if such care was ever being provided from these grievances." (Dkt. 172 at ¶ 56) (errors in original).

The Court is not persuaded by Warren's arguments. Warren was repeatedly seen by medical professionals in 2020. When the defendants received grievance appeals from Warren, either his complaints or the grievance responses being appealed (or both) indicated that he was under the care of medical professionals. Warren did not complain that he was being ignored; he complained that medical staff should address all his concerns in one visit, that he should be re-tested, that he should receive a second opinion, and so on. Warren conveyed to Zatecky and Reagle that he should receive *more* or *different* treatment than the medical staff provided, not that he was being ignored or mistreated.

It is fundamental that prisoners are not entitled to demand specific care from their medical providers. *Walker v. Wexford Health Sources*, 940 F.3d 954, 965 (7th Cir. 2019). They certainly

8

cannot demand that non-physician custody officers direct medical professionals to provide specific care, then sue them for damages if they decline to override the medical professionals' judgment. Because that is what Warren attempts to do here, the State Defendants are entitled to summary judgment.

To the extent a different analysis applies to Warren's assertions that the State Defendants wrongly denied his requests for hand sanitizer and COVID-19 testing and treatment in the early months of the pandemic, the result is no different. It is common knowledge that in the early stages of the pandemic, such supplies were in short supply. Warren has offered no evidence that the State Defendants had access to hand sanitizer, tests, or treatments that were not being used during that time of scarce resources. Absent such evidence, no reasonable trier of fact could conclude that the State Defendants regarded any need for those materials with deliberate indifference.

IV. **MOLD AND INHUMANE CONDITIONS**

When the Court screened Warren's complaint in 2023, it found that he alleged plausible claims that the State Defendants "knew about unsafe and unsanitary conditions in K-Dorm (including moldy showers, a broken exhaust fan, and inadequate sanitizer and sinks) and failed to take appropriate remedial action." (Dkt. 11 at 13). The Court permitted Warren to pursue Eighth Amendment claims against all four State Defendants on that basis. *Id.*

A. **FACTS**

Warren attests that the shower room walls and shower curtains in his housing unit, K-4, had mold "completely caked on." (Dkt. 150-1 at 136:6–8). An inmate assigned to clean the unit cleaned the mold regularly, but it would return "within a day or two." *Id.* at 136:18–25. An area of the ceiling near his bed had deteriorated and was covered in mold. *Id.* at 137:19–138:9. The inmate assigned to clean the unit cleaned the showers "daily." (Dkt. 150-19 at 3).

9

Warren never attempted to clean what he identified as mold because "that wasn't [his] responsibility" and he "had other jobs." *Id.* at 140:15–20.

When Warren arrived in K-4 in April 2020, only one of two exhaust fans were working. (Dkt. 150-1 at 142:18–143:11). But a work order was submitted, and the fan was repaired on May 20, 2020. *Id.*; (Dkts. 150-21, 150-22). The unit also had "really big" cockroaches and gnats, but Warren does not say how many or for how long. ("Dkt. 150-1 144:9–15).

There were five total sinks in K-4. *Id.* at 144:20–145:13. Three of the five were intermittently in disrepair and would not provide any water. *Id.* at 145:14–146:4. However, the sinks would be repaired periodically and work temporarily before falling back into disrepair. *Id.* ("I remember when they do fix them, it works fine for a while . . .").

In his summary judgment response, Warren alleges that Reagle "received multiple e-mails pertaining to K-4's mold and ceiling issues." (Dkt. 172 at ¶ 25). However, those e-mails were sent in September 2023, long after the timeframe implicated by his Complaint. Further, the e-mails do not document that mold was *present* in K-4. Rather, they document that inmates *complained* of mold, and the staff members on the e-mails state that there does not appear to be any mold. (Dkt. 173 at 164–173). Reagle attests that "allegations of mold in K-Dorm were looked into multiple times by the safety hazard manager and all were unsubstantiated." (Dkt. 50-10 at 9). Further, staff members specifically responded that they looked at the showers and the ceiling and determined that there was no mold. (Dkt. 173 at 164) ("I just came back from K-4—there is no mold in the showers or anywhere else I could see or smell it. . . . Also, the place in the ceiling doesn't appear to be mold, just old wood.").

10

According to Warren, Sergeant Jennifer Rinehart[4] power-washed the K-4 showers in the summer of 2021, knowing there was mold there, and causing mold spores to be sprayed throughout the unit. (Dkt. 172 at ¶ 26). However, the e-mails that Warren cites in support of this statement are from 2023. (Dkt. 173 at 164–73). And, in any event, those messages do not state that Sergeant Rinehart power-washed mold; instead, they include a message from her stating that anything thought to be mold should *not* be power-washed. (*See* Dkt. 173 at 172) ("You can not power wash anything you think is mold. It spreads the spores all over the place. I will check on it Monday. If it is mold, the II's will have to be moved somewhere else so it could be cleaned.").

According to Warren, "if the exhaust fan was repaired, [it] went out immediately and has been out since it was supposedly repaired." (Dkt. 172 at ¶ 27). In support of this statement, Warren cites his healthcare request made on July 19, 2020. On that date Warren sent in a sick call reporting that he was feeling dizzy, nauseated and dehydrated as his dorm was hotter than outside with no proper ventilation as half of the exhaust fans were not working. (Dkt. 173 at 137). However, Warren cites no evidence that the exhaust fan was inoperable for an extended time after he submitted that grievance or that his submission of a healthcare request would have given any of the State Defendants an opportunity to take steps to repair the broken fan.

**B.    LEGAL STANDARD**

It is fundamental that "the Constitution does not mandate comfortable prisons, and" some units "cannot be free of discomfort." *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981). "Jail conditions 'may be uncomfortable, even harsh, without being inhumane.'" *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 664–65 (7th Cir. 2012)).

---

[4] Sergeant Rinehart is not a defendant in this lawsuit.

Rather, "prisons must provide inmates with 'the minimal civilized measure of life's necessities.'" *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019). The Seventh Circuit has "interpreted this general statement as a requirement that prisons provide inmates with 'reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities.'" *Id.* (quoting *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016)).

A conditions-of-confinement claim includes objective and subjective components. *Giles*, 914 F.3d at 1051. Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). An excessive risk is synonymous with "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind—that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021). Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008). "In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

**C.   ANALYSIS**

Warren has not cited evidence from which a reasonable trier of fact could conclude that he was deprived of the minimal, civilized measure of living conditions or that, if such conditions were present, the State Defendants failed to respond reasonably to them.

Warren's testimony that he was subjected to dysfunctional sinks and exhaust fans does not support an Eighth Amendment claim. Warren does not maintain that he was deprived of water; rather, he states that, at times, he and his fellow cellmates had access to two sinks instead of five. This was no doubt inconvenient, but these facts do not support an inference that Warren was subjected to an unreasonable risk of harm. Further, Warren admits through his own testimony that, although the sinks broke frequently, they were also repaired. There similarly is no dispute that, although one exhaust fan was inoperable for a period of time, it was repaired. These facts do not support a conclusion that Warren faced an unreasonable risk of harm or that any defendant failed to respond unreasonably to such a risk.[5]

Infestation of vermin such as cockroaches is inconsistent with the adequate sanitation required by the Eighth Amendment and infestations of such pests brings with it risks to health. *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1411 (N.D. Calif. 1984). However, Warren's testimony that he complained of gnats and cockroaches does not support a finding that he was subjected to an unreasonable risk of harm, much less that any defendant was deliberately indifferent to it.

In *Thomas v. Illinois*, 697 F.3d 612 (7th Cir. 2012), the Seventh Circuit explained that the analysis depends on the interaction of several factors including "how extensive the infestation of a prisoner's cell is, what the infesting pests are, what odors or bites or risk of disease they create . . . and how long the infestation continues." *Id*. at 614. Thus, the severity of exposure, length of exposure, and resulting harm are balanced. In *Mitchell v. Foster*, for example, the plaintiff observed spider webs in his cell. No. 16-cv-097-MJR, 2016 WL 4194570, at *2 (S.D. Ill. Aug. 9, 2016). After informing prison officials, and having them fail to implement an extermination plan,

---

[5] Alternatively, if Mr. Warren's statement in his verified summary judgment brief that the fan went out immediately after it was repaired is true, it is not accompanied by a sworn statement or a citation to documentary evidence that any defendant knew as much. *See* dkt. 172 at ¶ 27. Therefore, his sworn statement cannot be evidence of deliberate indifference.

Mitchell was bitten by a brown recluse spider and received medical treatment. *Id* at *3. See also *Brown v. Duvall* where over a six-month period, "[p]laintiff described seeing two to three cockroaches during the day and twenty to thirty most nights and seeing mice a few times per week. 2016 WL 3125002, at *5 (N.D. Ill. Jun.3, 2016). These circumstances survived the objective prong of a motion for summary judgment.

      In contrast, Warren does not say how many cockroaches or gnats were present or for how long, and there is no evidence in the record to link any specific physical harms to Warren from any cockroaches or gnats. In addition, there is no evidence that "Reagle failed to properly investigate these issues" (Dkt. 172 at ¶ 61), and thus, no evidence that Reagle turned a blind eye to any pest issues.

      This leaves Warren's allegations regarding mold in the shower and on the ceiling near his bed. Warren designates no scientific evidence that the shower or the ceiling were covered with mold, such as laboratory test results or testimony from mold experts; rather, he believes it was mold based on his personal experience and common sense. (Dkt. 150-1 at 139:21–140:14) ("There's been no testing on any of that mold.")  Considering the designated evidence in the light most favorable to Warren, the Court finds his testimony that he can recognize mold and that he repeatedly saw mold in the showers and in the ceiling creates a factual dispute about whether mold was present in K-4.  This dispute is not material, however, because the record would not allow a finding of deliberate indifference.

      There is no dispute that the showers were cleaned regularly—perhaps as often as every day. By Warren's own testimony, the mold grew back, but then it was cleaned away again. This is how cleaning works, both in prisons and in the free world. Perhaps the State Defendants did not offer an optimal solution to the mold. But because the undisputed record demonstrates that the

State Defendants knew the substance Warren believed was mold was being cleaned away every day, no reasonable trier of fact could find that the defendants turned a blind eye to an unreasonable risk of harm.

Warren's statement that Sergeant Rhinehart power-washed the moldy areas is not supported by the e-mails he cites. Regardless, Sergeant Rinehart is not a defendant, so he cannot recover damages from her in this lawsuit. And, even if there was evidence that she power-washed the mold in the relevant timeframe, it would not allow Warren to recover damages from any of the State Defendants. Evidence that Sergeant Rinehart was deliberately indifferent to a serious risk of harm is not, standing alone, evidence that any State Defendant was deliberately indifferent. "Liability under [42 U.S.C.] § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).

Finally, Warren's argument for deliberate indifference to the mold in the ceiling is that certain State Defendants were included on e-mails discussing inmates' allegations that there was mold in the ceiling. In those e-mails, non-party Sergeant Rhinehart discussed that "the place in the ceiling doesn't appear to be mold, just old wood," and she asked whether the residents could be moved for cleaning of the showers and repairing of the ceiling. (Filing No. 173 at 164-165). However, those e-mails were communicated in September 2023.

Moreover, this argument is likely properly before the Court. Warren never raised this issue in his Complaint, and all evidence of mold in the ceiling postdates the remainder of his allegations by three years. Regardless, considering the evidence Warren has presented, no trier of fact could

find that any State Defendant *knew there was* mold in the ceiling. At best, they were copied on e-mails documenting that some September 2023, inmates *thought* there was mold in the ceiling, and staff members determined they were incorrect. The September 2023 e-mails did not notify any of the State Defendants of an imminent risk of serious harm. At best, it gave them reason to be *suspicious*, and that is far from the culpable state of mind for an Eighth Amendment violation.

## V. DIET

The record demonstrates that, twice in 2020, Warren was prescribed a 2,200 calorie-per-day diet, and Wilson, a Physician Assistant, changed his prescription to an 1,800 calorie-per-day diet.[6] Warren believes that the changes in his diet were removed in retaliation and deliberate indifference. Wilson attests that on one occasion Warren's prescription was removed because he was not in compliance with the diet and on another occasion she removed him because of his elevated A1C and because he was obese. (Ex. A at 95) On July 15, 2020, Warren submitted a grievance complaining about his diet and asking to be put back on a 2,200-calorie diet. A response to his grievance from Health Services Administrator Gibson states: "Offender seen by provider for chronic care appt on 7-15-20. Diet was discussed as offender's diet was changed from a 2200 to an 1800 diet due to his A1C." (Dkt. 150-4). Warren appealed the grievance response and Reagle responded to the grievance appeal and stated: "I am not a medical professional and in cases such as this, I must defer to those staff that are." (Dkt. 150-3).

Warren contends that Wilson's medical reasoning was flawed, and her stated reasons for changing the diet were not truthful, and Reagle was deliberately indifferent to his medical need for more food and the impact of the new diet on his health. (Dkt. 172 at 21, ¶¶ 47–48, 64). But Warren's argument illustrates why no Eighth Amendment diet claim against Reagle can prevail. The

---

[6] The Court acknowledged allegations to a diet-based claim in the screening order but did not identify any specific diet-based claims against any State Defendant. (Dkt. 11).

16

"division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles*, 914 F.3d at 1049. Warren argues that Wilson's medical decisions regarding his diet were incorrect and that he suffered medical harm as a result. This argument concedes that the changes to his diet and any harm he suffered as a result were medical in nature, and Reagle was therefore entitled by law to defer to Wilson's medical judgment. This is not a case where Warren was not "under the care of medical experts." *Id.* It is yet another case where Warren demanded specific care from his medical providers and, when they denied it, from his custodians. *Walker*, 940 F.3d at 965. That cannot be the foundation of an Eighth Amendment claim.

## VI. **INJUNCTIVE RELIEF**

Finally, the Court permitted a claim for injunctive relief only to proceed against Reagle in his official capacity because he would be the proper defendant to implement any injunctive relief. (Dkt. 11 at 9–10). Warren seeks an injunction requiring that mold be permanently removed from Pendleton, that he be seen by a respiratory expert and a tuberculosis expert, and that all parties follow any expert treatment plans. (Dkt. 2 at 23).

The State Defendants argue that this claim is moot on grounds that Warren has been removed from K-4. (Dkt. 153 at 26–27). Warren does not dispute that he has been removed from the unit but argues an injunctive relief claim remains viable because he may return to K-4 and should not be subjected to the same inhumane conditions. (Dkt. 172 at 39–40).

Claims for injunctive relief are moot because Warren is no longer incarcerated in K-4. "[W]hen a prisoner who seeks injunctive relief for a condition specific to a particular prison is transferred out of that prison, the need for relief . . . become[s] moot." *Lehn v. Holmes*, 364 F.3d 862, 871 (7th Cir. 2004). There is no evidence that Warren is likely to return to K-4 or that, if he

does, the conditions in K-4 are likely to be the same as when he departed. (Dkt. 150-1 at 33:9–12) ("They've since then finally after four years decided they were going to fix some of the things that I complained in this lawsuit that was wrong.").

## VII.   CONCLUSION

For the reasons explained in this Order, The State Defendants' Summary Judgment Motion, Dkt. [149], is **granted**. Claims against them are **dismissed with prejudice**.

No partial final judgment will issue.

**SO ORDERED.**

Date: 6/30/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

LARRY WARREN
230853
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov

Joseph A. Panatera
Cassiday Schade LLP
jpanatera@cassiday.com

David Matthew Price
Office of the Indiana Attorney General
david.price@atg.in.gov