# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LARRY WARREN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:22-cv-00661-TWP-DML |
| | ) | |
| WEXFORD OF INDIANA, LLC., | ) | |
| MD MARTIAL KNIESER, | ) | |
| AMBER PLASTERER, | ) | |
| LISA HAMBLEN H.S.A, | ) | |
| SHERI WILSON PA, | ) | |
| DUSHAN ZATECKY WARDEN, | ) | |
| DENNIS REAGLE DEPUTY WARDEN, | ) | |
| AARON SMITH ADMINISTRATION | ) | |
| ASSISTANT, | ) | |
| MCCUTCHEONS LT., | ) | |
| SARAH PECKHAM AMBURN UTM, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING MEDICAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment field by Defendants Martial Knieser, MD ("Dr. Knieser"), Lisa Hamblen, HSA ("Hamblen"), Sheri Wilson, PA/NP ("NP Wilson"), Amber Plasterer, RN ("Nurse Plasterer"), and Wexford of Indiana, LLC ("Wexford") (collectively the "Medical Defendants") (Dkt. 161).[1] Also pending is Warren's Motion for Assistance in Recruiting Counsel. (Dkt. 203). This lawsuit is based on Warren's allegations that his custodians at Pendleton Correctional Facility ("Pendleton") subjected him to inhumane

---

[1] Defendant Sarah Peckham Amburn moved separately for summary judgement concerning the claims against her (Dkt. 148), and State Defendants: Warden Dushan Zatecky, Deputy Warden Dennis Reagle, Administrative Assistant Aaron Smith, and Lieutenant Joseph McCutcheon moved separately for summary judgment (Dkt. 149). Those motions have been addressed in separate Orders. (*See* Dkts. 208, 210).

conditions of confinement and that officials were deliberately indifferent to his serious medical needs. He is pursuing Eighth Amendment deliberate indifference and First Amendment retaliation claims against his medical care providers. For the following reasons, the Medical Defendants' Motion for Summary Judgment, is **granted**, the request for assistance in recruiting counsel is **denied as moot** and claims against them are **dismissed with prejudice**.

## I. <u>LEGAL STANDARD</u>

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.  <u>FACTUAL BACKGROUND</u>

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Warren as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).

In March 2020, the COVID-19 pandemic hit the world, and no one, including Warren and or Pendleton officials could predict how long the pandemic would last. (Dkt. 150-1).

On May 27, 2020, Warren submitted a healthcare request complaining of several seemingly unrelated symptoms, including "a skin outbreak on [his] arms and thighs," "continued pain in left flank of stomach," "frequent and abnormal stool movements," hemorrhoids, and chest pains. (Dkt. 163-1 at 12). Warren also noted that he previously had respiratory problems and asked to be tested for COVID-19. *Id.*

Nurse Plasterer examined Warren on May 29, 2020. *Id.* at 14–16. She acknowledged that Warren asked to be seen for several symptoms, but she only examined the skin outbreak on his arms. *Id.* She wrote that Warren should be referred for further examination. *Id.* That day, Warren submitted another healthcare request stating that Nurse Plasterer refused to address any complaint beyond his skin issue. *Id.* at 13. He reiterated that he was experiencing abdominal pain, digestive troubles, anal bleeding, and hemorrhoids and wished to be tested for COVID-19. *Id.*

3

Nurse Plasterer saw Warren again on June 3, 2020. *Id.* at 17–19. Warren reiterated that he had multiple symptoms requiring attention and complained that Nurse Plasterer addressed only his skin outbreak on May 29. *Id.* This time, Nurse Plasterer felt and listened to Warren's abdomen and wrote that he should be referred for further examination. *Id.*

A week later, Warren saw Nurse Naomi Briner for an annual checkup. (Dkt. 163-1 at 22–24). She wrote that Warren had "multiple health complaints"—presumably similar to those he presented in his healthcare request and to Nurse Plasterer—but "none needing immediate treatment." *Id.*

On June 12, 2020 Dr. Knieser examined Warren with specific attention to his abdominal pain and discomfort. Dr. Knieser called for chest x-rays, bloodwork, and an electrocardiogram (EKG). (Dkt. 163-1 at 36–39).

On June 25, 2020 Warren submitted a healthcare request stating that he had not yet received the x-rays, bloodwork, or EKG Dr. Knieser promised. (Dkt. 163-1 at 51). He stated that symptoms he reported previously (e.g., abdominal pain, digestive problems, and a skin outbreak) were persisting and that he was encountering new symptoms (e.g., rectal bleeding and fatigue). *Id.*

On June 27, 2020 Nurse Madden had a follow-up test for tuberculosis scheduled. (Dkt. 163-1 at 52–53). Her records indicate Warren did not report for the test. *Id.*

On June 29, 2020, PA Wilson directed that Warren receive an 1800 calorie-per-day diet instead of a 2200 calorie-per-day diet. The medical records offer no explanation for this change. (Dkt. 163-1 at 54–55).

On July 7, 2020, Warren saw Dr. Knieser, who examined his skin breakout. (Dkt. 163-1 at 159–61). Dr. Knieser could not offer a specific diagnosis but decided to treat the condition as Lyme disease. *Id.* He prescribed a three-week antibiotic treatment. *Id.*

Nurse Madden administered Warren's follow-up tuberculosis test on July 9, 2020. (Dkt. 163-1 at 63–64). She noted Warren's reports of other ailments, including abdominal pain, lesions on his arms, and high blood pressure. *Id.* at 64.

PA Wilson documented on July 13, 2020 that Warren's tuberculosis test was positive, and he would therefore be placed in isolation. (Dkt. 163-1 at 66). She ordered chest x-rays. *Id.* at 68. Warren maintains that he was never isolated. (Dkt. 183 at ¶ 11).

PA Wilson met Warren on July 15, 2020 to discuss his tuberculosis diagnosis. (Dkt. 163-1 at 69–72). She noted that he had recently experienced night sweats, indicating this may be a symptom of tuberculosis. She also noted that he lost weight following his diet change. *Id.*

On July 26, 2020, Warren submitted a healthcare request stating that, since his diet changed, he was experiencing "hunger pains." (Dkt. 163-1 at 88). He added that the food-service provider was not even giving him his full 1800 calories. *Id.* He also reported that he was experiencing side effects from his tuberculosis medication, including red urine and stool. *Id.* That same day, Warren submitted a second healthcare request directed to Dr. Knieser. (Dkt. 163-1 at 89). He reiterated the side effects from his tuberculosis medication, stated that Dr. Knieser previously said he would test Warren for Crohn's disease, and asked to complete that test. *Id.*

On July 27, 2020, Warren submitted a healthcare request to receive ice so he could drink cold water to cope with summer heat, his medication made him thirsty, and so he could at least drink water since he was starving because of the change in his diet. *Id.* at 90. Warren again indicated that the food-service provider was only giving him half portions. *Id.*

Warren met with PA Wilson on August 5, 2010. (Dkt. 163-1 at 94–98). She discussed the side effects of his medications and reassured Warren that his orange urine and stool was a normal

reaction to his medication, and discussed his decreased diet, but did not change either. *Id.* She noted that Warren had lost five pounds. *Id.*

On August 17, 2020 Warren sent PA Wilson healthcare requests asking when she would order the food-service contract to reinstate his 2200-calorie diet and prescribe medication for his skin condition. (Dkt. 163-1 at 113–14). On August 20, he sent her another healthcare request reporting he received a vitamin treatment and asking why he was on an antibiotic. *Id.* at 115.

On August 25, 2020 PA Wilson removed Warren from the 1800 calorie-per-day diet, noting that he had not complied with his diet for nine of his previous twenty-one meals. *Id.* (Dkt. 163-1 at 118). It is not clear what diet he was placed on thereafter, or how it differed from the 1800-calorie diet.

On August 28, 2020 Warren submitted a healthcare inquiring when PA Wilson would provide treatment for his skin condition. (Dkt. 163-1 at 119). He submitted another request accusing someone of removing him from the 1800-calorie diet in retaliation for his submission of healthcare requests. *Id.* at 120. He submitted another request asking Dr. Knieser why he was on an antibiotic and whether he was being treated for Lyme disease. *Id.* at 121.

Warren saw PA Wilson for a checkup on October 2, 2020. (Dkt. 163-1 at 131–37). On October 5, she re-prescribed a 2200 calorie-per-day diet. *Id.* at 143.

Hamblen—also known as Lisa Gibson—was a health services administrator (HSA) during this period. (Dkt. 163-5 at ¶ 2). Her responsibilities were purely administrative, and her practice did not include providing medical treatment. *Id.* at ¶¶ 4–5. When Warren submitted healthcare requests, nurses sometimes forwarded them to Hamblen, and she responded either with information from Warren's medical records or from medical practitioners. *Id.* at ¶ 16. In addition

to healthcare requests, Hamblen provided responses to Warren's grievances and other information requests. (Dkt. 185 at 24–27, 34–44, 62, 70, 80, 91).

Warren initiated this action on April 1, 2022. (Dkt. 2). The Court identified the following claims in its 2023 Screening Order:

> (1) injunctive relief against Deputy Warden Reagle in his official capacity; (2) Eighth Amendment medical care claims for damages against Wexford, Dr. Knieser, Nurse Amber, Ms. Gibson, Nurse Wilson, Warden Zatecky and Deputy Warden Reagle; (3) Eighth Amendment conditions-of confinement claims for damages against Warden Zatecky, Deputy Warden Reagle, Mr. Smith, Lt. McCutcheons, Ms. Amburn, and Nurse Wilson; and (4) First Amendment retaliation claims against Amburn and Nurse Wilson.

(Dkt. 11 at 14). This Order addresses the Medical Defendants motion for summary judgment on the claims pending against to them.

## III.  ANALYSIS: EIGHTH AMENDMENT CLAIMS

The Eighth Amendment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

"A medical condition is serious if it 'has been diagnosed by a physician as mandating treatment' or 'is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Perry v. Sims*, 990 F.3d 505, 511 (7th Cir. 2021) (quoting *Greeno v. Daley*, 414 F.3d

645, 653 (7th Cir. 2005)). Deliberate indifference requires a finding that the defendants "consciously disregarded a serious risk to [Warren's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up). Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, the plaintiff must offer evidence that the defendants "actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30.

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Id.* at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

## A.     Overall Course of Treatment

The parties address deliberate indifference on a defendant-by-defendant basis. This is proper because "[l]iability under [42 U.S.C.] § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "[I]ndividual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted).

"As an initial matter," though, "we look at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties*, 836 F.3d at 728. And, viewed as a whole, the record the parties have developed would not allow a reasonable trier of fact to determine that the defendants were deliberately indifferent to Warren's serious medical needs.

The evidence the parties have designated and the facts they have assembled in their summary judgment briefs concern the period from May 27, 2020 until October 5, 2020—barely four months. In that time, Warren submitted ten healthcare request forms. He saw nurses at least four times, PA Wilson three times, and Dr. Knieser twice. There is no basis, therefore, for finding that the defendants ignored Warren's medical needs all together.

Warren's initial healthcare request complained of numerous symptoms, including a skin outbreak, abdominal pain, digestive troubles, hemorrhoids, and chest pains. He also requested to be tested for COVID-19 based on respiratory problems he experienced previously. Warren received specific attention for his skin condition, abdominal pain, and digestive troubles, as well as for issues he raised after May 27, 2020, such as his diet and tuberculosis.

The record does not indicate that Warren received care specific to his complaints of hemorrhoids and chest pains between May 27 and October 5, 2020. But Warren did not raise specific complaints about hemorrhoids or chest pains in the eight healthcare requests he submitted after his initial appointment with Nurse Plasterer. There is therefore no evidence from which a reasonable jury could conclude that the Medical Defendants knew that Warren faced an imminent risk of serious harm evidenced by his hemorrhoids or chest pain throughout the four-month period.

The record also does not indicate that Warren was tested for COVID-19 between May 27 and October 5, 2020. But Warren indicated that his request was based on respiratory issues he experienced previously—not an ongoing medical need.

Finally, Warren reiterates throughout his summary judgment response that, although he identified numerous medical issues in his May 27, 2020 request, the defendants did not address every issue in his appointments over the following weeks. The fact that the defendants began with his skin issue, then addressed his abdominal issues, rather than dive simultaneously into each of his many complaints in his first appointment, is not evidence of deliberate indifference. The Eighth Amendment permits medical practitioners to exercise judgment as to which of an inmate's conditions need urgent treatment and which can wait.[2] Further, nondefendant Nurse Briner determined during Warren's June 11, 2020 checkup that none of his "multiple health complaints" required "immediate treatment." (Dkt. 163-1 at 22–24). Warren does not address this evidence, and it directly supports a finding that the treating defendants' decisions to prioritize some complaints over others were exercises of medical judgment and that those judgments were not substantial departures from accepted norms. *See Petties*, 836 F.3d at 729.

**B.    Dr. Knieser**

The defendants argue that Dr. Knieser is entitled to summary judgment because he interacted only twice with Warren during the relevant timeframe and both those interactions were reasonable. Warren asserts numerous counterarguments, none of which prevails.

---

[2] *See Gayton v. McCoy*, 593 F.3d 610, 622 (7th Cir. 2010) ("Prison policy dictates that a doctor is supposed to be contacted if a prisoner complains of a serious medical condition, specifically including chest pain. At all other times there is a nurse or nurse practitioner on site to handle minor emergencies and other ailments. Although mandating a doctor's visit or constant prisoner checks would likely reduce the number of illness-related deaths or injuries, it is neither economically prudent nor feasible to put such policies in place.").

Warren states that Dr. Knieser "doesn't recall ever issuing any pain medication for Plaintiff's left flank pain, stomach pain, chest pain and other serious medical symptoms." (Dkt. 183 at 14). But Warren did not request pain medication in any of his written requests, and although he believes that he did so orally, he could not state so with certainty.[3] Further, Warren testified that he had access to over-the-counter pain medication, *see* dkt. 136-6 at 63:6–13, and he offers no evidence that stronger pain medication was warranted—much less that Dr. Knieser's failure to prescribe stronger medicine amounted to deliberate indifference.

Warren argues that he "was not properly diagnosed and treated for mold exposure." (Dkt. 183 at 14). If Warren ever was diagnosed with any mold-related illness, he has not directed the Court to evidence of that diagnosis. As a result, he has not designated evidence that Dr. Knieser was deliberately indifferent to a mold-related illness.

Warren notes that approximately two weeks passed between his May 27, 2020 healthcare request and his first appointment with Dr. Knieser. *Id.* at 15. But he saw nurses *three times* during that period. This precludes any finding that Dr. Knieser knew Warren faced a serious risk that was going unattended—particularly given Nurse Briner's observation that none of Warren's concerns required "immediate treatment." (Dkt. 163-1 at 22–24).

Warren argues that Dr. Knieser was deliberately indifferent to his serious medical conditions because he "was supposed to have ordered" tests and x-rays on June 12, 2020, but they were never completed. (Dkt. 183 at 15). However, Warren wrote on June 25, 2020, that Dr. Knieser "actually submitted the orders through the computer" during the appointment. (Dkt. 163-1 at 51).[4]

---

[3] Dkt. 136-6 at 63:18–24 ("Did you ever specifically request medication to treat that pain?" "I'm sure I did. I'm sure I did it with probably Miss Plasterer, I'm sure I did it with Knieser, I am sure I did it with Wilson. I told them I was in pain. The record shows that I was in pain.").

[4] Warren states in a surreply, which he verified under penalty of perjury, that he saw Dr. Knieser "input his notes into the computer thinking it was ordering tests." (Dkt. 196 at 6–7). But Warren cannot offer new evidence in a surreply. S.D. Ind. L.R. 56-1(d) (A surreply "must be limited to the [defendants'] new evidence and objections."). The evidence

Warren designates no evidence that Dr. Knieser was responsible for whatever failure caused the orders not to be carried out or that such failure demonstrates anything more than negligence.

Warren argues that Dr. Knieser was deliberately indifferent because he promised to test Warren for Crohn's disease but never did so. (Dkt. 183 at 15). But Warren has presented no evidence that he *has* Crohn's disease such that Dr. Knieser's failure to order the test delayed his treatment. Indeed, Warren testified in his deposition that he has never been tested or treated for Crohn's disease despite having ongoing bowel issues and undergoing several medical tests. (Dkt. 163-6 at 69:24–70:8).

Warren argues that Dr. Knieser exhibited deliberate indifference by diagnosing him with gall bladder disease, Lyme disease, and tuberculosis without completing proper diagnostic tests. (Dkt. 183 at 15–16). But Warren has not provided any evidence to support his assertion that Dr. Knieser's diagnostic techniques were improper or medically insufficient or what he should have done instead. As such, a jury would have no evidentiary basis for finding that Dr. Knieser exceeded the accepted range medical judgments. *Petties*, 836 F.3d at 729.

Warren argues that Dr. Knieser's deliberate indifference is shown by his ultimately unsuccessful prescription of an antibiotic to treat his skin condition. (Dkt. 183 at 17). But a defendant who responds reasonably to a medical condition is not deliberately indifferent, even if the treatment is not successful. *Gayton*, 593 F.3d at 620 (quoting *Farmer*, 511 U.S. at 843). Warren has offered no evidence to support a finding that prescription of an antibiotic was unreasonable. Warren argues that the antibiotic "injured the plaintiff by him having blood in his urine and stool." (Dkt. 183 at 17). But he has provided no evidence that the antibiotic *caused* this condition, much less that Dr. Knieser was deliberately indifferent to the risk of such a side effect. Such a showing

---

Warren addresses in his surreply was not newly submitted; it was submitted with the defendants' original motion. Therefore, Warren's testimony that he saw Dr. Knieser submit orders through the computer is uncontradicted.

would be exceptionally difficult given Warren's complaints of anal bleeding *before* he was prescribed the antibiotic and that he originally complained that his tuberculosis medication was causing these side effects. (Dkt. 163-1 at 13, 88).

Finally, Warren notes that he was diagnosed with internal hemorrhoids in August 2019. (Dkt. 183 at 17). Warren argues that Dr. Knieser should have recognized that diagnosis when he treated him in 2020 and approached Warren's anal bleeding as if caused by hemorrhoids. *Id.* But Warren complained of numerous conditions, including abdominal pain and bowel issues, and there is no dispute that Dr. Knieser at least attempted to treat those symptoms. (Dkt. 163-1 at 36–39). Perhaps a different or even a better doctor would have begun by exploring Warren's hemorrhoids. But Warren has not provided evidence to support a conclusion that Dr. Knieser's decision to begin at the other end of the digestive tract was outside the realm of accepted medical judgment.

Looking at the totality of the care he provided, no reasonable trier of fact could find that Dr. Knieser was deliberately indifferent to Warren's serious medical needs. *Petties*, 836 F.3d at 728. He is entitled to summary judgment.

## C.    Nurse Plasterer

The Defendants argue that Nurse Plasterer is entitled to summary judgment because she treated Warren reasonably during their two interactions on May 29 and June 3, 2020. Warren argues that Nurse Plasterer was deliberately indifferent when she treated him for only one complaint per visit. The Court rejected this argument above. The Eighth Amendment permitted her to prioritize Warren's complaints. *See Gayton*, 593 F.3d at 622. To the extent Warren argues that she prioritized them incorrectly, he has not offered evidence to support that argument, particularly given Nurse Briner's determination *after* both of Nurse Plasterer's examinations that none of Warren's conditions required immediate treatment. (Dkt. 163-1 at 22–24).

Warren implies that Nurse Plasterer misdiagnosed his skin condition on May 29, 2020.(Dkt. 183 at 20). However, all she did was note his symptoms and refer him to Dr. Knieser. (Dkt. 16-1 at 16). Warren similarly alleges that Nurse Plasterer failed to provide him pain medication during the May 29 and June 3, 2020 visits, (Dkt. 183 at 22), but he offers no evidence that she was authorized to prescribe medication stronger than the over-the-counter drugs he could access—much less that her failure to do so was deliberate indifference. Accordingly, Nurse Plasterer is entitled to summary judgment.

**D.    Hamblen**

The Medical Defendants argue that Hamblen is entitled to summary judgment because, in her limited role of responding to Warren's written requests, she did not act with deliberate indifference to any of his medical conditions. Nothing in the record would allow a reasonable juror to conclude otherwise.

Hamblen did not work at the prison as a doctor or nurse; rather, she performed administrative functions. The "division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands . . . absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Id.* (internal quotations omitted.)

Warren argues that Hamblen is liable to him under the Eighth Amendment because she ignored his complaints and "did nothing to fix plaintiff's issues nor did she follow up with his health issues." (Dkt. 183 at 24). But Warren does not state what Hamblen should have done differently—much less offer evidence that she could have done something differently. He does not

cite evidence that Hamblen prevented a healthcare request from reaching a staff member such that an appointment was delayed. Rather, he argues that she "refused to intervene" in his medical treatment. (Dkt. 183 at 25). But this argument assumes without evidence that Hamblen had authority to intervene and direct that Warren receive treatment that his doctors and nurses had not deemed necessary or appropriate. The record discussed above leaves no doubt that Warren was receiving medical care during the relevant period. As such, she was justified in deferring to the doctors and nurses who were treating him.

Warren argues that Hamblen did not act timely on requests to treat respiratory issues. (Dkt. 183 at 25–27). But the requests Warren references are not healthcare requests; they are a grievance appeal (which it is not clear Hamblen received) and requests for information, and Hamblen responded by relaying relevant information or encouraging Warren to submit a healthcare request. (*See* Dkt. 185 at 30, 38, 41–44).

Hamblen is entitled to summary judgment.

### E.    PA Wilson

The Medical Defendants argue that PA Wilson is entitled to summary judgment because her modification of Warren's diet was not deliberately indifferent to a serious medical need and did not impose an inhumane condition, and that the cancellation of his 1800 calorie diabetic diet due to noncompliance, was a decision subject to sound medial judgment. (Dkt. 162 at 9). Warren argues that PA Wilson's deliberate indifference is reflected both by her management of his diet and by her treatment of a skin condition. Both arguments fail.

The undisputed facts are that before June 29, 2020, Warren was on a 2200 calorie-per-day diet due to diabetes, and on June 29, PA Wilson ordered that he receive an 1800 calorie-per-day diabetic diet instead. (Dkt. 163-1 at 54–55). On July 26 and 27, Warren complained in healthcare

requests that he was experiencing hunger pains because the food-service provider was not providing him full portions on the 1800-calorie diet. (Dkt. 163-1 at 88–89). Warren met with PA Wilson on August 5, but she made no changes to his diet. (Dkt. 163-1 at 94–98). On August 17, Warren sent PA Wilson healthcare requests asking when she would order the food-service contractor to reinstate his 2200-calorie diet. (Dkt. 163-1 at 113–14). On August 25, PA Wilson removed Warren from the 1800 calorie-per-day diet. *Id.* (Dkt. 163-1 at 118). It is not clear what diet he was placed on or how it differed from the 1800-calorie diet. Warren saw PA Wilson for a checkup on October 2, 2020. (Dkt. 163-1 at 131–37). On October 5, she re-prescribed a 2200 calorie-per-day diet. *Id.* at 143. In short, Warren was on an 1800-calorie diet from June 29, 2020, until August 25, 2020 then on a different diet until October 5, 2020 when he was returned to a 2200-calorie diet.

According to Warren, PA Wilson explained that the 1800-calorie diet was ordered because Warren was diabetic and his A1C was 7.1, and although PA Wilson never said he was obese, he thinks that information was provided in one of his medical records. (Dkt. 150-1 at 95-96). Warren also reports he was told his diet was being cancelled due to noncompliance, but he was never noncompliant. Warren characterizes PA Wilson's changes to his diet as malicious and retaliatory (Dkt. 183 at 29), but he cites no evidence to support either assertion. Rather, he argues that PA Wilson's explanations for the dietary changes are not rational because his A1C was not elevated, he was never obese, and she had him confused with someone else. (Dkt. 150-1 at 95-97). Even assuming that PA Wilson's reasons for changing Warren's diet were not logical or medically sound, he has not provided evidence that she was deliberately indifferent to a serious risk of harm as necessary to violate the Eighth Amendment.

Warren cites no evidence about differences between the 2200- and 1800-calorie diabetic diets and the diet he was on between August 25 and October 5, 2020. He states that he suffered hunger pains and stomach cramps when his diet was changed, but he offers no evidence that he suffered any medical problem.[5] Further, he admits that the food-service contractor did not serve him complete meals even on the 1800-calorie diet, and he offers no evidence that NP Wilson was responsible for or involved in placing food on his tray.

The defendants argue that the record reflects that Warren was not injured by his change to the 1800-calorie diet because he later requested to have that diet restored. (Dkt. 191 at 26–27). More broadly, though, the record fails to support any inference that Warren suffered a medical problem or was subjected to an inhumane condition due to his dietary changes.

There is no doubt that the Eighth Amendment requires prisons to provide inmates with adequate nourishment, but Warren offers no legal authority to support a conclusion that 1800 calories are too few to satisfy the Constitution. He offers no evidence at all regarding the composition of the post-1800-calorie diet and therefore has not shown that it was medically dangerous or inhumane. Warren offers no evidence that he suffered anything more than hunger pains due to changes in his diet and no legal authority to support a conclusion that hunger pains are enough to trigger an Eighth Amendment violation. *See Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996) ("Deliberately to ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment, . . . but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized.

---

[5] Warren also experienced heartburn of unspecified severity due to the dietary change, (Dkt. 183 at 31), but the documents he cites do not appear to include any reference to heartburn. Therefore, even accepting his statement that he experienced heartburn as true, no evidence supports an inference that PA Wilson knew about it.

. . . A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution.") (internal citations omitted).

Warren also argues that PA Wilson exhibited deliberate indifference to a serious medical condition when she misdiagnosed a rash, *see* dkt. 183 at 30, but he cites no evidence of her diagnosis beyond his own unsworn healthcare requests. Regardless, he cites no evidence to support a conclusion that her diagnosis or treatment were incorrect, much less deliberately indifferent.

## F.    Wexford

The Court permitted Warren to sue the individual medical defendants' employer, Wexford of Indiana, LLC, under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), on the theory that the defendants violated his constitutional rights due to a Wexford policy, practice, or custom. The defendants correctly argue that Wexford is entitled to summary judgment because an entity "cannot be liable under *Monell* when there is no underlying constitutional violation by" one of its employees. *Gaetjens v. City of Loves Park*, 4 F.4th 487, 495 (7th Cir. 2021) (internal quotation omitted). In response Warren reasserts the claims the Court has addressed above: that the Medical Defendants did not treat every ailment listed in his healthcare request on his first visit and that the individual medical defendants' treatment of his medical conditions was deliberately indifferent. Because there is no evidence from which a trier of fact could find an underlying constitutional violation, Wexford is entitled to summary judgment.

## IV.  <u>ANALYSIS: FIRST AMENDMENT CLAIM</u>

Warren also claims that PA Wilson violated his First Amendment rights by changing his diet in retaliation for his pursuit of medical care requests and grievances.

To establish a prima face case for retaliation on summary judgment, a plaintiff must have evidence to support three elements. "First, he must show he engaged in protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

The "motivating factor" requirement "amounts to a causal link between the activity and the unlawful retaliation." *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). "Suspicious timing alone will rarely be sufficient to create a triable issue" on the motivating factor element, especially where an alternative motive exists. *Id.* To establish that retaliatory animus was a motivating factor in the defendants' retaliatory action, the plaintiff must show, at a minimum, that the defendants were aware of the plaintiff's protected activity. *See, e.g.*, *Daugherty v. Page*, 906 F.3d 606, 610 (7th Cir. 2018) (affirming grant of summary judgment when inmate presented only "vague and confusing testimony that [the inmate], at some point, named [the defendant] in a grievance" but "no evidence about what the grievance said or whether [the defendant] even saw or knew about it").

The defendants argue that PA Wilson did not violate the First Amendment because her adjustments to Warren's diet were medical decisions not motivated by retaliation. (Dkt. 162 at 28–29). Warren responds that PA Wilson "did retaliate against him for filing grievances, [healthcare requests] and request forms." (Dkt. 183 at 34). But he does not identify any grievance, healthcare request, or request form as the motivating factor behind her actions. Although Warren cites grievances and medical care requests throughout his summary judgment response, he does not explain how any one document or group of documents provoked PA Wilson to change his diet.

19

Warren has shown himself capable of making and responding to arguments and citing evidence to support them. The Court will not "scour the record" for evidence that might support a retaliation claim or connect the dots for him. *Grant*, 870 F.3d 573−74; *Hall v. Flannery*, 840 F.3d 922, 927 (7th Cir. 2016) (Failure to raise an argument "is fatal" as courts are "not in the business of formulating arguments for the parties."). PA Wilson is entitled to summary judgment on the First Amendment claims made against her.

## V.    CONCLUSION

The Court has empathy for Warren who suffered from several medical conditions in 2020, however, he has failed to meet his burden of showing that there are genuine disputes of material fact that require a trial. For the reasons explained in this Order, the Medical Defendants' Motion for Summary Judgment, Dkt. [161], is **GRANTED** and the claims against them are **dismissed with prejudice**.

Warren ably represented himself in this action. Because all claims in this action have been resolved, his Motion for Assistance in Recruiting Counsel, Dkt. [203], is **DENIED** as moot.

Final judgment will issue in a separate order.

**SO ORDERED.**

Date: 7/11/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

LARRY WARREN
230853
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Christopher Douglas Cody
HUME SMITH GEDDES GREEN & SIMMONS
ccody@humesmith.com

Bryan Findley
CASSIDAY SCHADE LLP
bfindley@cassiday.com

Gustavo Angel Jimenez
INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov

Joseph A. Panatera
Cassiday Schade LLP
jpanatera@cassiday.com

David Matthew Price
Office of the Indiana Attorney General
david.price@atg.in.gov